IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                         Cr. No. 20-2031 KG

ERASMO J. GRANILLO,

       Defendant.

<u>MEMORANDUM OPINION AND ORDER</u>

On November 12, 2020, a Grand Jury returned an Indictment against Defendant for one count of transporting an illegal alien, in contravention of 8 U.S.C. § 1324(a)(1)(A)(ii), and aiding and abetting, in contravention of 8 U.S.C. § 1324(a)(1)(A)(v)(II). (Doc. 36). The Indictment alleges that the crime occurred "[o]n or about August 18, 2020, in Luna County, in the District of New Mexico…." *Id.*

On October 15, 2020, Defendant filed the instant pre-Indictment Motion to Suppress Physical Evidence and Statements (Motion to Suppress). (Doc. 31). The Motion to Suppress is fully and timely briefed. *See* (Docs. 32 and 33).

On January 7, 2021, the Court held an evidentiary hearing on the Motion to Suppress. Kristopher Jarvis and Christopher Solis represented the United States, and Margaret Strickland represented Defendant, who was present. United States Border Patrol Agent (BPA) Joshua Sifuentes and Acting Patrol Agent in Charge (APAIC) Ralph Reyes testified on behalf of the United States.

Having considered the briefing, controlling law, credible testimony presented at the evidentiary hearing, evidence admitted at the evidentiary hearing, oral argument by counsel, and for the following reasons, the Court denies the Motion to Suppress.

*I. Factual Findings[1]*

Prior to his arrest on August 18, 2020, Defendant encountered BPAs on August 14, 2020, and August 15, 2020. BPA Sifuentes was involved in the August 14, 2020, encounter as well as in Defendant's arrest on August 18, 2020. BPA Sifuentes has 12 years and 10 months of experience as a BPA at the Deming Border Patrol Station. For the last year and a half, BPA Sifuentes has been a member of the Anti-Smuggling Unit (ASU).

APAIC Reyes was involved only in the August 18, 2020, arrest of Defendant. APAIC Reyes has 22 years of experience with the United States Border Patrol (USBP). On August 18, 2020, he was the Acting Patrol Agent in Charge of the Deming Border Patrol Station. APAIC Reyes has served three years as a first line supervisor at the Deming Border Patrol Station.

   *A. The August 14, 2020, Encounter*

On the night of August 14, 2020, a BPA conducted surveillance on a suspected illegal alien stash house in Columbus, New Mexico. During the surveillance, the BPA observed a black Chevrolet Silverado pickup truck approaching the suspected stash house.

The black Chevrolet Silverado pickup truck is a Trail Boss Edition with a brush guard, dark tinted windows, grill lights, an antenna, and a New Mexico license plate registered to a Columbus, New Mexico, address. BPA Sifuentes testified that the pickup truck appears to

---

[1] Defendant stated at the hearing that the Court did not need to resolve many factual disputes. Defendant agreed to stipulate to those facts presented in both the Motion to Suppress and the United States' response. The Court, therefore, will rely on the stipulated facts as well as facts developed at the hearing in making its factual findings.

mimic a law enforcement vehicle.  In explaining his observation, BPA Sifuentes testified that he does not know any civilians with similar grill lights on their pickup trucks.

As the black Chevrolet Silverado pickup truck advanced toward the suspected stash house, the driver turned off the head lights and backed the pickup truck into the driveway of the house located across the street from the suspected stash house. Once the pickup truck stopped, the BPA, using infrared equipment, observed two people exit the pickup truck and walk towards the back of the pickup truck.  The BPA saw the two people using an infrared flashlight, light only visible with night vision equipment.  After a short while, the two people got back into the pickup truck and the pickup truck drove away with its head lights still off.

The BPA attempted to initiate a traffic stop by turning on his vehicle's emergency equipment.  The pickup truck did not yield to the BPA.  Instead, the pickup truck sped for approximately two blocks before stopping at a house.

The BPA followed the pickup truck to the house.  At the house, the BPA told the occupants of the pickup truck that he is a United States Border Patrol Agent.  The BPA identified the driver as Defendant.  The BPA also questioned the two passengers in the pickup truck about their citizenship and determined that they were United States citizens.

The BPA obtained consent to search the pickup truck and located several two-way radios, police scanners, binoculars, and night vision equipment.  At some point after the stop, BPA Sifuentes arrived at the house as backup whereupon he observed the black Chevrolet Silverado pickup truck, including its brush guard, as well as two-way radios, police scanners, binoculars, and night vision equipment in the pickup truck.  BPA Sifuentes also spoke with the BPA on the scene.  Defendant and his two passengers were subsequently released.

In BPA Sifuentes' experience, smugglers use two-way radios to communicate with each other due to the lack of cellular coverage along the United States/Mexico border.  Also, in BPA Sifuentes' experience, smugglers use police scanners to intercept law enforcement communications.  Finally, in BPA Sifuentes' experience, smugglers use binoculars and night vision equipment to observe and locate law enforcement.

B. *The August 15, 2020, Encounter*

The next day, August 15, 2020, Las Cruces BPAs saw a black Chevrolet Silverado pickup truck exiting County Road B004, a primitive dirt ranch road, onto New Mexico State Road (NMSR) 549, a paved road.  County Road B004 circumvents the Border Patrol checkpoint on Interstate 10, east of Deming, New Mexico.  In BPA Sifuentes' experience, smugglers use County Road B004 to smuggle illegal aliens into the United States.

The Las Cruces BPAs attempted to initiate a traffic stop of the pickup truck, but it sped away.  After a five-minute pursuit, the pickup truck stopped.  The Las Cruces BPAs identified the driver as Defendant and took him into custody.  The Las Cruces BPAs later released Defendant.

Prior to Defendant's arrest on August 18, 2020, BPA Sifuentes read a report on the August 15, 2020, encounter.  BPA Sifuentes, relying on his training and experience, believed that Defendant conducted a "dry run" on August 15, 2020, to determine if he would encounter law enforcement officers on County Road B004.  According to BPA Sifuentes, smugglers conduct a "dry run" to determine if their actions will elicit a response from law enforcement.

C. *The August 18, 2020, Encounter*

On August 18, 2020, BPAs Sifuentes and Jose L. Chavez were engaged in a roving patrol while heading east on NMSR 9, a paved road located east of Columbus, New Mexico.  The BPAs were in an unmarked sedan and wore civilian clothes.

At approximately noon, the BPAs saw the black Chevrolet Silverado pickup truck involved in the August 14, 2020, and August 15, 2020, encounters heading west on NMSR 9, near mile marker 116, which is 0.39 miles from the United States/Mexico border.  That area is sparsely populated and an area BPA Sifuentes routinely patrols.  Although a shorter border wall existed in that area in August 2020, in BPA Sifuentes' experience, the area had a higher volume of illicit traffic in August 2020 due the recent USBP policy of immediately removing illegal aliens to Mexico because of the COVID-19 pandemic.[2]

Upon seeing the pickup truck, BPA Sifuentes recalled the encounter on August 14, 2020, involving the same pickup truck and its driver, Defendant.  BPA Sifuentes remembered the police scanners, binoculars, two-way radios, and night vision equipment found in the pickup truck.  BPA Sifuentes also recalled reading the report about the August 15, 2020, encounter involving, again, the same pickup truck and Defendant.

Considering BPA Sifuentes' experience in apprehending smugglers and his knowledge of the August 14, 2020, and August 15, 2020, encounters, BPA Sifuentes performed a U-turn to observe the driving behavior of the black Chevrolet Silverado pickup truck.  BPA Sifuentes testified that he would have followed the pickup truck even if he had no knowledge of the August 14, 2020, and August 15, 2020, encounters because one would not normally see such a distinctive pickup truck near mile marker 116 on NMSR 9.

---

[2] The Court considers this to mean that illegal border crossers are not criminally prosecuted or administratively processed for removal as was the federal procedure before the pandemic.

BPA Sifuentes drove westbound on NMSR 9 at the speed limit and at a sufficient distance from the black Chevrolet Silverado pickup truck so as not to alert the driver of his presence.  The driver of the pickup truck, however, drove at a speed in excess of the speed limit, which caused the BPAs to lose visual contact of the pickup truck.

At about 12:20 p.m., while continuing westbound on NMSR 9 toward Columbus, New Mexico, the BPAs observed the black Chevrolet Silverado pickup truck travelling east on Pol Ranch Road, a paved but not well-maintained road with potholes.  In BPA Sifuentes' experience, not many people drive on Pol Ranch Road.

BPA Sifuentes decided to drive east on Pol Ranch Road to try to locate the pickup truck. The BPAs subsequently stopped at the intersection of Pol Ranch Road and San Diego/Gomez Road (also known as Whirlwind Road or County Road B005).[3]  While at the intersection, BPA Sifuentes asked the driver of a white flatbed pickup truck, a typical ranch truck observed on those roads, if he had seen a black Chevrolet Silverado pickup truck.  The driver responded that he saw a black pickup truck driving north on Gomez Road, a dirt road.  Only about six buildings, possibly residences, are located on or around San Diego/Gomez Road, which is several miles long.

BPA Sifuentes then drove north on San Diego/Gomez Road until he reached the northern end of San Diego/Gomez Road, which intersects with Irwin Road.  At that point, both roads are not very well-maintained dirt roads.  BPA Sifuentes stopped at the intersection of San Diego/Gomez Road and Irwin Road, where he exited his vehicle and inspected the area.  BPA Sifuentes found fresh tire marks similar to tire marks a pickup truck would leave.  BPA Sifuentes

---

[3] Pol Ranch Road turns into a dirt road past the intersection with San Diego/Gomez Road.

also observed that it appeared the driver had taken a right hand turn, going east on Irwin Road, at a high rate of speed and then accelerated quickly.

The BPAs did not travel east on Irwin Road to pursue the black Chevrolet Silverado pickup truck due to the poor road conditions.  That part of Irwin Road has ruts and washouts for about a two mile stretch that a sedan could not safely travel over.  In his experience, BPA Sifuentes has occasionally seen local ranchers, hunters, and recreationists on those roads, but none with a pickup truck like the black Chevrolet Silverado pickup truck.  Also, in BPA Sifuentes' experience, the ranchers typically drive relatively slowly on those dirt roads due to their poor condition.

Travelling west on Irwin Road, Irwin Road intersects with NMSR 11, a paved highway, on the west side of the Florida Mountains.  If a vehicle travels north on NMSR 11 from Irwin Road toward Deming, New Mexico, that vehicle must pass through a USBP checkpoint.  However, if a vehicle travels east on Irwin Road, then north on No Name Road, a rough and remote dirt road with several gates and overgrown mesquite bushes, to NMSR 549 and then west on NMSR 549 to Deming, New Mexico, the vehicle will travel east of the Florida Mountains and not pass through a USBP checkpoint.  Going north on No Name Road, one will encounter a few homes in the Ranchettes subdivision, south of NMSR 549.  If one intends to circumvent the USBP checkpoint on NMSR 11 from the intersection of San Diego/Gomez Road and Irwin Road, this route of travel is the most direct route to Deming, New Mexico.

While at the intersection of San Diego/Gomez Road and Irwin Road, BPA Sifuentes determined, based on his experience and training, that the black Chevrolet Silverado pickup truck was attempting to circumvent the USBP checkpoint on NMSR 11 by travelling east on Irwin Road, north onto No Name Road, and then west on NMSR 549 to Deming, New Mexico.

That route of travel, beginning at mile marker 116 on NMSR 9 and ending in Deming, New Mexico, covers approximately 79.2 miles over a combination of paved and rough dirt roads.

If one travels from mile marker 116 on NMSR 9 west to Columbus, New Mexico, then north on NMSR 11 to Deming, New Mexico, that route of travel covers approximately 60.4 miles. That entire route is on paved roads and is safer to travel on than the route BPA Sifuentes believed the black Chevrolet Silverado pickup truck travelled.

BPA Sifuentes believed that the driver of the black Chevrolet Silverado pickup truck intended to circumvent the USBP checkpoint on NMSR 11 via Irwin Road, No Name Road, and NMSR 549. As a result, BPA Sifuentes communicated with a supervisor in Deming, New Mexico, what he had observed and asked him to broadcast those observations on the radio. BPA Sifuentes then drove west on Irwin Road to NMSR 11. He then continued north on NMSR 11 toward Deming, New Mexico, traveling close to 90 miles an hour in an attempt to intercept the black Chevrolet Silverado pickup truck in Deming, New Mexico.

APAIC Reyes heard on the radio that a known smuggling vehicle was attempting to circumvent the NMSR 11 checkpoint and was located east of the Florida Mountains. The radio broadcast described the vehicle as a black Chevrolet pickup truck with tinted windows and a black brush guard. In response to the radio broadcast, APAIC Reyes travelled east on NMSR 549 toward Franklin Road, the only point of exit from the Florida Mountains. At that time, APAIC Reyes was wearing his Border Patrol uniform but driving an unmarked vehicle with law enforcement lights in the grill.

APAIC Reyes saw the black Chevrolet Silverado pickup truck approaching him on NMSR 549, heading west. APAIC Reyes pulled onto the shoulder of the road to get a better view of the vehicle and to perform a U-turn to get a closer look of the vehicle. APAIC Reyes

waited for a vehicle to pass before he performed the U-turn.  APAIC Reyes then verified over the radio that the vehicle he was looking for had police lights on the grill and an antenna.

As APAIC Reyes followed the pickup truck, he noticed that the pickup truck was pulling ahead of him, even as APAIC Reyes drove over 90 miles an hour.  Nonetheless, APAIC Reyes was able to maintain visual contact with the pickup truck due to the scarcity of traffic on the road and the pickup truck's black color.  In APAIC Reyes' experience, people sometimes speed when they are engaged in illegal activities, but not always.

APAIC Reyes eventually saw the black Chevrolet Silverado pickup truck turn onto Pine Street in Deming, New Mexico, and he radioed that information.  As APAIC Reyes also turned onto Pine Street, he heard BPA Sifuentes radio that he observed the pickup truck turn into a carwash on Pine Street.  BPA Sifuentes followed the pickup truck to the carwash and positioned his sedan to the right of the pickup truck, at a distance to avoid detection, to await APAIC Reyes. When APAIC Reyes arrived at the carwash, he parked his vehicle behind a building near the carwash also to avoid detection.  APAIC Reyes could see an individual washing the pickup truck.

APAIC Reyes subsequently told BPA Sifuentes to pull in closer to the black Chevrolet Silverado pickup truck and make contact with the driver.  BPA Sifuentes parked behind the pickup truck and saw the driver, later identified as Defendant, washing the pickup truck.  APAIC Reyes then positioned his vehicle to the right front side of the pickup truck and activated his emergency equipment.  As APAIC Reyes exited his vehicle, BPA Sifuentes approached Defendant for questioning.  Defendant was subsequently arrested when APAIC Reyes discovered illegal aliens in the black Chevrolet pickup truck.

Although Defendant washed some of the pickup truck before BPA Sifuentes questioned him, the pickup truck still had dirt on the running boards and around the tires at the time of Defendant's arrest.  In his experience and training, BPA Sifuentes believed Defendant to be washing away dirt evidencing his travels on dirt roads.

### D.  Other Factual Findings

BPA Sifuentes has conducted approximately 20 stops on the ranch roads north of NMSR 9 and south of NMSR 549.  Including Defendant's arrest, BPA Sifuentes has arrested approximately four persons as a result of those stops.

## II.  The Motion to Suppress

Defendant moves to suppress the evidence and statements obtained as result of the August 18, 2020, stop at the Deming carwash. *See United States v. Guerrero-Espinoza*, 462 F.3d 1302, 1310 (10th Cir. 2006) (observing that "as a general rule any evidence obtained as a result of [an unlawful] detention must be excluded as fruit of the poisonous tree") (citations omitted). Defendant asserts that BPA Sifuentes violated his Fourth Amendment right to be free from an unreasonable seizure when BPA Sifuentes stopped him at the Deming carwash without any reasonable suspicion that he was engaged in criminal activity.  Defendant specifically contends that BPA Sifuentes should not have relied on the August 14, 2020, and August 15, 2020, encounters to form a reasonable suspicion on August 18, 2020, because the BPAs involved in those encounters, likewise, violated the Fourth Amendment by lacking reasonable suspicion to stop Defendant.

The United States counters that the facts, including BPA Sifuentes' knowledge of the August 14, 2020, and August 15, 2020, encounters, demonstrate that BPA Sifuentes had reasonable suspicion to stop Defendant at the Deming carwash on August 18, 2020, for possibly

smuggling illegal aliens or contraband from nearby Mexico. The United States, in the alternative, argues that even excluding the August 14, 2020, and August 15, 2020, encounters from his consideration, BPA Sifuentes had reasonable suspicion to stop Defendant at the Deming carwash on August 18, 2020. Accordingly, the United States asserts that BPA Sifuentes did not violate Defendant's Fourth Amendment right to be free from an unreasonable seizure.

III.  *Legal Conclusions*

   A.  *Standard of Review*

In deciding this Motion to Suppress, "the district court must assess the credibility of witnesses and determine the weight to give to the evidence presented…." *United States v. Goebel*, 959 F.3d 1259, 1265 (10th Cir. 2020).   Any "inferences the district court draws from that evidence and testimony are entirely within its discretion." *Id.*

"To successfully suppress evidence as the fruit of an unlawful detention, a defendant must first establish that the detention did violate his Fourth Amendment rights." *United States v. Nava-Ramirez*, 210 F.3d 1128, 1131 (10th Cir. 2000). Once a defendant establishes that violation, "[t]he defendant then bears the burden of demonstrating 'a factual nexus between the illegality and the challenged evidence.'" *Id.* (citation omitted). "Only if the defendant has made these two showings must the government prove that the evidence sought to be suppressed is not 'fruit of the poisonous tree,' either by demonstrating the evidence would have been inevitably discovered, was discovered through independent means, or was so attenuated from the illegality as to dissipate the taint of the unlawful conduct." *Id.* The Court notes that "the controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence." *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974).

11

B.  *Reasonable Suspicion to Stop Defendant*

"The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest."  *United States v. Quintana-Garcia*, 343 F.3d 1266, 1270 (10th Cir. 2003) (quotation marks and citations omitted).  The Fourth Amendment is "satisfied in this context if the officer's action is supported by reasonable suspicion to believe that criminal activity 'may be afoot.'"  *Id.* (quotation marks and citations omitted).  Reasonable suspicion is an objective standard, and "the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity."  *United States v. Cortez*, 449 U.S. 411, 417-18 (1981); *see also United States v. De La Cruz*, 703 F.3d 1193, 1197 (10th Cir. 2013) (observing that "existence of reasonable suspicion … is measured from the perspective of an objectively reasonable officer, not from the subjective perspective of the particular officer on scene").  Although reasonable suspicion requires "something more than an inchoate and unparticularized suspicion or hunch, the level of suspicion required ... is considerably less than proof by a preponderance of the evidence or that required for probable cause."  *United States v. McHugh*, 639 F.3d 1250, 1255–56 (10th Cir. 2011) (internal quotation marks and brackets omitted).  "Reasonable suspicion is based on the totality of the circumstances, taking into account an officer's reasonable inferences based on training, experience, and common sense." *United States v. Rice*, 483 F.3d 1079, 1083 (10th Cir. 2007).

Similarly, "[b]order patrol agents 'on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion' that those vehicles' occupants may be involved in criminal activity."  *See United States v. Cantu*, 87 F.3d 1118, 1121 (10th Cir. 1996) (quoting *United*

12

*States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975)).  In determining whether a roving BPA had

reasonable suspicion to stop a vehicle, a court, likewise, must consider the totality of the

circumstances "from the perspective of the reasonable *officer*, not the reasonable *person.*"

*Quintana-Garcia*, 343 F.3d at 1270 (emphasis in original).  "In all situations the officer is

entitled to assess the facts in light of his experience in detecting illegal entry and smuggling."

*Brignoni-Ponce*, 422 U.S. at 885.

When determining whether reasonable suspicion supports a roving patrol stop in a border

area, a court may consider any number of factors, including:

> (1) [the] characteristics of the area in which the vehicle is encountered; (2) the proximity
> of the area to the border; (3) the usual patterns of traffic on the particular road; (4) the
> previous experience of the agent with alien traffic; (5) information about recent illegal
> border crossings in the area; (6) the driver's behavior, including any obvious attempts to
> evade officers; (7) aspects of the vehicle, such as a station wagon with concealed
> compartments; and (8) the appearance that the vehicle is heavily loaded.

*United States v. Monsisvais*, 907 F.2d 987, 990 (10th Cir. 1990) (citing *Brignoni-Ponce*, 422

U.S. at 884-85).  Furthermore, "[w]hen evaluating an officer's decision to stop a vehicle, a court

may not engage in a 'sort of divide-and-conquer analysis' by evaluating and rejecting each factor

in isolation." *United States v. Cheromiah*, 455 F.3d 1216, 1221 (10th Cir. 2006) (citation

omitted).  Indeed, factors that, by themselves, may be "consistent with innocent travel" may

collectively amount to reasonable suspicion.  *United States v. Arvizu*, 534 U.S. 266, 274-75

(2002).  Finally, the United States bears the burden "of establishing by a preponderance of the

evidence that reasonable suspicion supported the officer's stop of Defendant's vehicle."

*United States v. Burciaga*, 687 F.3d 1229, 1230 (10th Cir. 2012).

### 1.  Collective Knowledge Doctrine and Hearsay Statements

As an initial matter, the Court notes that under the horizontal collective knowledge

doctrine, the knowledge of the BPAs involved in the August 14, 2020, and August 15, 2020,

encounters can be imputed to BPA Sifuentes.  The horizontal collective knowledge doctrine applies if "a number of individual officers have pieces of the probable cause or reasonable suspicion puzzle, but no single officer has sufficient information to satisfy the necessary standard." *United States v. Latorre*, 893 F.3d 744, 753 (10th Cir. 2018) (citation omitted).  In that situation, the officers "pool[] their collective knowledge to meet the" reasonable suspicion threshold for a stop.[4]  *United States v. Chavez*, 534 F.3d 1338, 1345 (10th Cir. 2008).

Nonetheless, Defendant argues that the United States cannot rely on the hearsay statements by the BPAs involved in the August 14, 2020, and August 15, 2020, encounters to establish reasonable suspicion without showing that those statements bear an indicia of reliability, i.e., without calling those BPAs as witnesses at a suppression hearing.  Indeed, "hearsay testimony is admissible at a suppression hearing as long as it bears sufficient indicia of reliability." *United States v. Yarbrough*, 527 F.3d 1092, 1099 n.3 (10th Cir. 2008).

In this case, however, the record does not indicate that the statements the BPAs at the August 14, 2020, and August 15, 2020, encounters made were false, and the Court does not have "any reason to doubt the statements were made." *United States v. Merritt*, 695 F.2d 1263, 1270 (10th Cir. 1982).  The Court, therefore, concludes that the hearsay statements by the BPAs present at the August 14, 2020, and August 15, 2020, encounters are sufficiently reliable for this Court to consider in deciding the Motion to Suppress. *Id.* (holding that district court need not exclude out-of-court statements from consideration at suppression hearing where record did not

---

[4] The Court further notes that under the vertical collective knowledge doctrine "the knowledge and reasonable suspicions" of BPA Sifuentes "can be imputed" to APAIC Reyes. *United States v. Cruz*, 338 F. Supp. 3d 1235, 1241 (D.N.M. 2018), *aff'd sub nom. United States v. Ybarra Cruz*, 982 F.3d 1284 (10th Cir. 2020) (citation omitted).  The vertical collective knowledge doctrine provides that "an officer with reasonable suspicion may instruct another officer to make a *Terry* stop without communicating the basis for the stop, so long as the communicating officer has reasonable suspicion to make the stop himself." *Id.* (citation omitted).

indicate statements were false and district court had no reason to doubt statements had in fact been made).

### 2.  *Defendant's Bootstrap Argument*

Defendant also argues that the BPAs did not have reasonable suspicion to stop him on August 14, 2020, and August 15, 2020.  Consequently, Defendant asserts that his identity as the driver of the black Chevrolet Silverado pickup truck at those two encounters and the fact that police scanners, two-way radios, binoculars, and night vision equipment were discovered in his pickup truck on August 14, 2020, are subject to suppression as fruit of the poisonous tree.  As such, Defendant contends that BPA Sifuentes cannot bootstrap those "illegal seizures" to create reasonable suspicion for the August 18, 2020, stop at the Deming carwash.  In fact, the Tenth Circuit has held that "[o]bservations made during an illegal detention cannot be used to bootstrap reasonable suspicion."  *United States v. Kaguras*, 183 Fed. Appx. 783, 788 (10th Cir. 2006).

The United States argues, however, that the August 14, 2020, and August 15, 2020, encounters were not illegal detentions for the purpose of this Motion to Suppress because Defendant has not shown a factual nexus between those alleged illegalities and the challenged evidence from the August 18, 2020, stop at the Deming carwash.  In other words, the United States argues that Defendant has not shown "but for" causation, i.e., that "the evidence sought to be suppressed would not have come to light but for the government's unconstitutional conduct." *Nava-Ramirez*, 210 F.3d at 1131.

Notwithstanding the United States "but for" argument, the Court will assume for the sake of argument only that Defendant's identity as the driver of the black Chevrolet Silverado pickup truck at the August 14, 2020, and August 15, 2020, encounters is subject to suppression as is the fact that police scanners, two-way radios, binoculars, and night vision equipment were

discovered in the black Chevrolet Silverado pickup truck on August 14, 2020.  With that

assumption in mind, the Court will address the *Brignoni-Ponce* factors for determining

reasonable suspicion to stop a vehicle near the United States/Mexico border.

### 3.  Relevant Brignoni-Ponce Factors

#### a. Characteristics of the Area

To begin with, NMSR 9 "is well-known for drug and alien smuggling apprehensions."

*United States v. Holguin-Chavez,* 279 Fed. Appx. 668, 669 (10th Cir. 2008); *see also United*

*States v. Rivero*, 2017 WL 4402424, at *7 (D.N.M.), *report and recommendation adopted,* 2017

WL 5450250 (D.N.M.) (finding that "the area of State Road 9 where the traffic stop occurred is

frequently used by illegal alien smugglers as a route to retrieve and transport illegal aliens").

Moreover, the dirt roads north of NMSR 9 and south of NMSR 549 circumvent the USBP

checkpoints on NMSR 11 and Interstate 10.

Additionally, the area around NMSR 9, including Pol Ranch Road, a paved road with

potholes, and remote dirt ranch roads like San Diego/Gomez Road, Irwin Road, and No Name

Road, is sparsely populated.  Furthermore, portions of those dirt roads are so primitive that

travelling on them, let alone speeding on them, is unsafe.  Also, a stretch of No Name Road has

overgrown mesquite brush that will damage vehicles.

#### b.  Proximity to the Border

Mile marker 116 on NMSR 9 is a mere 0.39 miles from the United States/Mexico Border.

*See, e.g., Cheromiah*, 455 F.3d at 1221 (finding that BPA's stop of "van only 85 miles from the

border in an area frequented by smugglers" was permissible).

### c. Traffic Patterns

Before addressing the traffic patterns factor, the Court discusses which roads Defendant travelled on August 18, 2020.  BPA Sifuentes observed the black Chevrolet Silverado pickup truck traveling west on NMSR 9 and then east on Pol Ranch Road.  Next, a BPA could reasonably infer from the observation of the driver of the white flatbed pickup truck at the intersection of Pol Ranch Road and San Diego/Gomez Road that the black Chevrolet Silverado pickup truck headed north on San Diego/Gomez Road.  A BPA also could reasonably infer from the fresh truck tire marks at the intersection of San Diego/Gomez Road and Irwin Road that the black Chevrolet Silverado pickup truck headed east onto Irwin Road.  A BPA with BPA Sifuentes' training, experience, and collective knowledge of the actions of the driver of the black Chevrolet Silverado pickup truck on August 14, 2020, and August 15, 2020, (excluding Defendant's identity and the presence of police scanners, two-way radios, binoculars, and night vision equipment in the pickup truck) could further reasonably conclude that the pickup truck would then take the shortest route to Deming, New Mexico, via No Name Road and NMSR 549.

Pol Ranch Road, San Diego/Gomez Road, Irwin Road, and No Name Road see few vehicles, other than vehicles driven by ranchers and, occasionally, by hunters and recreationists. Few people travel those roads because they do not provide a direct and safe route to Deming, New Mexico, nor do they lead to many residences or commercial facilities.

### d. Agent Experience with Alien Traffic

BPA Sifuentes has nearly 13 years of Border Patrol experience in the Deming area and has been a member of the ASU for the last year and a half.  *See, e.g., United States v. Barron-Cabrera*, 119 F.3d 1454, 1460–61 (10th Cir. 1997) (finding that BPA "established sufficient previous experience with alien traffic to satisfy the fourth prong of the *Brignoni–Ponce* test"

given that BPA had "been a Border Patrol agent for 3 ½ years, during the most recent three of

which he was assigned to the Deming, New Mexico Border Patrol station").

### e.  Information About Recent Border Crossings

The USBP's recent policy to remove illegal aliens immediately to Mexico due to the

COVID 19 pandemic has led to an increase in illegal crossings and alien smuggling in the USBP

Deming Station area.

### f.  Driver's Behavior

Through the collective knowledge doctrine, BPA Sifuentes was aware that on August 14,

2020, the driver of the black Chevrolet Silverado pickup truck was driving with the headlights

off, carried passengers who used infrared flashlights, and refused to yield to a BPA's vehicle

with its emergency lights activated.  Moreover, a BPA with BPA Sifuentes' collective

knowledge of the August 14, 2020, and August 15, 2020, encounters (excluding Defendant's

identity and knowledge of the police scanners, two-way radios, binoculars, and night vision

equipment in the pickup truck), and his training and experience, could reasonably conclude that

on August 15, 2020, the driver of the black Chevrolet Silverado pickup truck conducted a "dry

run" for smuggling illegal aliens or contraband.

On August 18, 2020, BPA Sifuentes observed the driver of the black Chevrolet Silverado

pickup truck speeding west on NMSR 9.  Moreover, BPA Sifuentes observed fresh truck tire

marks at the intersection of San Diego/Gomez Road and Irwin Road.  A BPA with BPA

Sifuentes' training and experience could reasonably conclude that those truck tire marks

indicated a high rate of speed, an uncommon and hazardous way to drive on the dirt roads east of

the Florida Mountains.  Also, a BPA could reasonably believe that the driver of that pickup truck

proceeded east on Irwin Road and north on No Name Road, both remote and, at times, unsafe

dirt roads east of the Florida Mountains which circumvent the NMSR 11 USBP checkpoint and provide the shortest route to Deming, New Mexico.  APAIC Reyes further observed the black Chevrolet Silverado pickup truck speeding on NMSR 549 as it headed west to Deming, New Mexico.  Finally, once the pickup truck arrived in Deming, the driver drove directly to a carwash to wash dirt off the pickup truck.

### g. *Appearance of Defendant's Pickup Truck*

With respect to this last *Brignoni-Ponce* factor, the black Chevrolet Silverado pickup truck did not appear to be heavily loaded.  The black Chevrolet Silverado pickup truck had a brush guard, grill lights, and an antenna.  The Court is not persuaded the appearance of this pickup truck indicated the driver's intention to deflect law enforcement attention from his pickup truck.  Indeed, the appearance of this pickup truck could actually draw the attention of law enforcement.  Even so, the pickup truck had dirt on it on August 18, 2020, consistent with traveling on dirt roads. This fact further added to BPA Sifuentes' reasonable suspicion.

### C. *Conclusion*

If one views the facts and the relevant *Brignoni-Ponce* factors in isolation, Defendant's August 18, 2020, travels on the isolated dirt ranch roads east of Columbus, New Mexico, and Deming, New Mexico, may appear innocent, as Defendant proposes.  However, even excluding from consideration Defendant's identity revealed in the August 14, 2020, and August 15, 2020, encounters, and the August 15, 2020, discovery of police scanners, two-way radios, binoculars, and night vision equipment, viewing the facts and the relevant *Brignoni-Ponce* factors under a totality of the circumstances standard, BPA Sifuentes was aware of specific articulable facts from which a BPA with BPA Sifuentes' extensive experience and training in the Deming area could make reasonable inferences warranting a reasonable suspicion that the driver of the black

Chevrolet Silverado pickup truck was transporting contraband, whether illegal aliens or other contraband. *See Cheromiah*, 455 F.3d at 1221 (observing that court "may not engage in a 'sort of divide-and-conquer analysis' by evaluating and rejecting each [*Brignoni-Ponce*] factor in isolation") (citation omitted)).  Accordingly, the Court concludes that the United States has carried its burden of showing by a preponderance of the evidence that the August 18, 2020, stop at the Deming carwash did not violate Defendant's Fourth Amendment right to be free from an unreasonable seizure.  The Court, thus, will deny the Motion to Suppress.

IT IS ORDERED that the Motion to Suppress Physical Evidence and Statements (Doc. 31) is denied.

_____
UNITED STATES DISTRICT JUDGE